

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 3, 2017

**IN RE CASYN B., ET AL.**[1]

**Appeal from the Juvenile Court for Coffee County**
**No. 16J0408          Timothy R. Brock, Judge**

_____

**No. M2016-01958-COA-R3-PT**

_____

A father appeals the termination of his parental rights. The court terminated the father's rights on the grounds of abandonment by engaging in conduct that exhibited wanton disregard for the children's welfare, as well as substantial noncompliance with the permanency plan. The court found that termination was in the children's best interests. Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C. J., and J. STEVEN STAFFORD, P. J., W. S., joined.

C. Brent Keeton, Manchester, Tennessee, for the appellant, Robert B.

Herbert H. Slatery, III, Attorney General and Reporter; Ellison M. Berryhill, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. FACTUAL AND PROCEDURAL HISTORY**

Brittany M. ("Mother") and Robert B. ("Father") are parents of three children, two of whom are the subject of this appeal: Casyn B., born in January 2010, and Cayden M., born in November 2012. Father is not listed as the father on Cayden's birth certificate, but he was established as father in an order of legitimation entered January 21, 2014.[2]

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

[2] The order of legitimation is referenced in the petition to terminate Father's rights, but it is not in the record. Father does not dispute that he is the father of Cayden.

The Tennessee Department Children's Services ("DCS") became involved with the family in November 2013 when it received a referral based on allegations of abuse to Casyn. As stated in the petition to adjudicate dependency and neglect, filed on December 11, 2013, DCS observed during its investigation that the home in which Mother lived was "cluttered with old food and clothes and around 6 adults and 4 children and multiple animals living in the 3-4 bedroom home." When DCS tested Mother for drugs during the investigation, she tested positive and admitted to snorting opiates, Xanax, and "'shake and bake' methamphetamines." The petition alleged that during this time, Father was incarcerated.

The children were placed in the custody of DCS in December 2013 and settled in a foster home. At a hearing in January 2014, counsel for both parents appeared and waived the parties' right to a formal adjudicatory hearing, and the juvenile court adjudicated Casyn and Cayden to be dependent and neglected by an order entered in March 2014.[3]

Permanency plans were created in January 2014, June 2014, January 2015, and October 2015; all were ratified by the court. The first three were created during Father's incarceration and required that Father resolve his legal issues and once released, contact DCS "to be added to the permanency plan." At some point during DCS' involvement, Mother surrendered her parental rights to both children, and her rights are not at issue in this appeal.[4] Father was released from prison in September 2015, and a new permanency plan was created in October 2015 that required Father to, *inter alia*, follow all rules of his parole; not engage in illegal activities or obtain new charges; complete an alcohol and drug assessment; and submit to and pass all random drug screens. Father was arrested in December 2015 for driving on a revoked or suspended license and released on bond; he was arrested again and jailed on numerous charges in February 2016.

DCS filed a petition to terminate Father's parental rights on May 9, 2016, while Father was incarcerated. The petition alleged as grounds for termination that Father was in substantial noncompliance with the permanency plan, Tennessee Code Annotated sections 36-1-113(g)(2) and 37-2-403(a)(2), and that he had abandoned the children by failing to visit or support them and by engaging in conduct that evidenced wanton

---

[3] Another child, Chase B., was born to Mother and Father in May 2011. In the protective custody order, the court found that "The Department learned that custody of Chase B[.] had been granted to a third party and neither parent retained legal custody of this child. The Department announced to the court it would non-suit the petition as to Chase." Chase was not a subject of the petition to terminate Father's rights, and no issue is raised regarding him on appeal.

[4] Although there is no order evidencing Mother's surrender, the court's termination order states that ". . . Their birth mother, Brittany M[.], has previously appeared before this court and voluntarily surrendered her parental rights to the children. This surrender has become final."

2

disregard for their welfare, pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(iv).  It also alleged that termination was in the best interest of both children.

A trial was held on July 25 before the Juvenile Court of Coffee County. DCS called Father, DCS case manager Seandra Dartis, and DCS team leader Eric Coure to testify. Eighteen exhibits were entered without objection.  Father presented no additional witnesses or proof.   At the conclusion of the trial, the court made oral findings of fact and granted the petition.  An order of termination was entered on August 22, terminating Father's parental rights on the grounds of substantial noncompliance with the permanency plan and abandonment by conduct that exhibited wanton disregard for the welfare of the children, and upon a finding that termination was in the children's best interest.

Father appeals, articulating the following issue:

Is there sufficient evidence in the record shown by clear and convincing evidence, after a *de novo* review, to support the statutory grounds for termination of parental rights of the Appellant as well as that the termination of parental rights was in the best interests of the subject children?

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).  However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004).  The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004).  Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).  To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69.  A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the

child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and that "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## III. DISCUSSION

In the order terminating Father's parental rights, the court made extensive findings of fact relative to: the dependency and neglect proceeding, including the creation of the permanency plan and Father's obligations under the plan; Father's criminal history, incarceration, and parole; his involvement with DCS and his substance abuse during his parole; and the condition of the children in foster care and Father's visitation with them. On the basis of those findings, the court terminated Father's rights on the grounds of substantial noncompliance with the permanency plan and abandonment by engaging in conduct that evidenced Father's wanton disregard for the welfare of his children.[5] We have reviewed the evidence cited by the court in the order as well as that cited by the parties in the briefs and, as more fully discussed *infra*, have determined that there is clear and convincing evidence in support of the findings. We proceed to address whether the findings support the grounds for termination.

### A. Substantial Noncompliance

Once children have come into the custody of DCS, a ground for termination is "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2). The Tennessee Supreme Court has observed that:

> A parent's rights may be terminated for her substantial noncompliance with the responsibilities contained in a permanency plan, Tenn. Code Ann. § 36–1–113(g)(2), so long as the plan requirements are "reasonable and related to

---

[5] The court did not make a determination as to the grounds of abandonment by failure to support or failure to visit.

remedying the conditions which necessitate[d] foster care placement." *In re Valentine,* 79 S.W.3d 539, 547 (Tenn. 2002). Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and "going through the motions" does not constitute substantial compliance. *Id.*

*In re Carrington H.*, 483 S.W.3d 507, 537 (Tenn. 2016), *cert. denied sub nom. Vanessa G. v. Tenn. Dep't. of Children's Servs.*, 137 S. Ct. 44, 196 L. Ed. 2d 28 (2016). Elaborating on this ground in *In re M.J.B.*, this Court stated that "[t]rivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." 140 S.W.3d at 656–57 (citing *In re Valentine*, 79 S.W.3d at 548; *Dep't. of Children's Servs. v. C.L.,* No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003)). Whether there has been substantial noncompliance with a permanency plan is a question of law, reviewed on appeal *de novo* with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548.

With respect to this ground, the court held:

Based upon the above factual findings, the court finds that the Department has established by clear and convincing evidence grounds for termination as alleged in its petition based upon substantial noncompliance with the obligation under the permanency plan of October 21, 2015 (Exhibit 15). [Father]'s principal obligations under the plan w[ere] to address his substance abuse issues and remain out of trouble. He testified that he has had a substance abuse problem since he was in his early teens[6] and in fact began to abuse drugs, according to his testimony, as soon as he was released from prison. [Father] failed to provide documentation of his purported treatment of this problem while in prison in 2014-2015. In January when he failed his drug test with his parole officer and again with DCS, he was provided with information for a treatment program near to where he lived that was free of charge. Furthermore, he did not follow the rules of his probation. In addition to the failed drug test, he incurred charges for driving on a revoked license in December, 2015 and then ultimately was charged with a string of crimes in February 2016, which included theft of property (two counts) , burglary of a motor vehicle (two counts), vandalism, illegal possession of a weapon, and aggravated burglary. [Father]'s new charges have not been adjudicated, but he has 10 months more to serve on his prior felony convictions as the result of a parole violation. [Father]'s failure to address this single issue has resulted

---

[6] The testimony in the record does not support the finding that Father has abused drugs since his "early teens"; however, Father admitted he has a drug problem.

in a major setback to his reunification with these children. Furthermore, the court finds at the time he was incarcerated this last time in February 2016 he had made no meaningful progress on his remaining obligations — to obtain housing, legal employment, and learning to parent the children.

The October 2015 permanency plan required Father to pay support, once an amount was set by the court;[7] have a legal source of income and provide verification of employment to DCS; follow all rules of his parole; not engage in illegal activities or obtain new charges; complete a parenting class and provide DCS with a certificate of completion; obtain safe and stable housing; complete an alcohol and drug assessment; submit to and pass all random drug screens; obtain an appropriate written transportation plan; and develop an appropriate support system. With respect to those obligations, we note that the court found that "the most significant obligations for [Father] to address concerned his substance abuse problems and avoid[ing] further criminal activity which would curtail his liberty." The factual findings in the holding quoted above are supported by the testimony of Ms. Dartis, Mr. Coure, and Father and support the determination that Father failed to substantially comply with the parenting plan.

Father argues that he "substantially complied with the requirements when viewing them in totality and in light of the severe indigency of [Father]." Specifically, he argues that he "made reasonable efforts to address his substance abuse after being released from prison in September 2015" and that he "substantially complied with the requirements of employment, housing, and visitation." The record belies his argument. Contrary to his contention, the evidence shows that, while the permanency plan was in effect, Father used drugs, did not go to an alcohol and drug assessment because he was "strung out," failed drug tests, lived in places that were not suitable for his children, and violated the terms of his parole when he was charged with numerous offenses in the five months he was not incarcerated. Further, while DCS set up weekly therapeutic visitation with the youngest child, Father participated only five times.

The holding that Father failed to substantially comply with the requirements of the permanency plan is supported by clear and convincing evidence, and we affirm the termination of his parental rights on this ground.

### B. Wanton Disregard

Tennessee Code Annotated § 36-1-113(g)(1) designates abandonment, as defined at section 36-1-102, as a ground for terminating parental rights. Tennessee Code Annotated § 36-1-102 defines "abandonment" as "engag[ing] in conduct prior to incarceration that exhibits wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv); *In re Audrey S.* 182 S.W.3d at 865. This court has stated that

---

[7] The record does not show that an order of support was entered.

Tennessee Code Annotated § 36-1-102(1)(A)(iv) "reflects the commonsense notion that parental incarceration is a strong indicator that there may be other problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. Although "[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child," incarceration alone does not satisfy the test for abandonment under section 36-1-102(1)(A)(iv). *Id.* To sustain the ground, the court must find "by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *Id.* Accordingly, a parent's incarceration is "a triggering mechanism" that allows the court to "take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

The pre-incarceration conduct referred to in Tennessee Code Annotated § 36-1-102(1)(A)(iv) "is not limited to acts during the four-month period immediately preceding the incarceration." *In re Jeremiah T.*, No. E2008-02099-COA-R3-PT, 2009 WL 1162860, at *8 (Tenn. Ct. App. Apr. 30, 2009) (citing *In re Audrey S.*, 182 S.W.3d at 871). "It is well-established that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the child's welfare." *In re C.L.D.*, No. M2008-02805-COA-R3-PT, 2009 WL 1684667, at *6 (Tenn. Ct. App. June 15, 2009) (citing *In re Audrey S.*, 182 S.W.3d at 868).

Regarding this ground, the court held as follows:

Based upon clear and convincing evidence presented to this court, [Father] has engaged in a pattern of conduct that evidences a wanton disregard for the welfare of the children. . . . Here, it is clear that [Father's] conduct since the birth of each child exhibits a wanton disregard for his children's welfare. Pursuant to the dictates of In Re Anthony R., No. M2014-01753-COA-R3-PT[, 2015 WL 3611244, at *3] (Tenn. [Ct.] App., June 9, 2015) the court limits its inquiry to the father's conduct since the birth of each child. It appears that since the birth of Casyn in January 2010, the child's father has been the subject of 34 separate criminal charges or violations of conditions of release that have resulted in confinement in the Coffee County Jail. (See Exhibits 13 & 16) Since Cayden's birth there have been 21 such events. As discussed above, he received five years of TDOC confinement in February 2014 and is now subject to return to the penitentiary as the result of a parole violation; and he faces significant imprisonment on charges that accrued in February, 2016. Additionally, [Father] has continued to abuse drugs once he was released from prison last fall. He has not visited the children with great regularity despite the

7

opportunity to do so in the months he was not incarcerated. He has at best made minimal progress on the goals of the permanency plan. From the totality of the evidence before the court, [Father] has since the birth of each of his children engaged in a pattern of behavior that exhibits a wanton disregard for the welfare of his children and a disregard for his responsibilities as a parent.

Father does not dispute the factual findings contained in this holding but argues that his offenses "are mainly property crimes and misdemeanor drug offenses that would not necessarily endanger the safety of the children" and therefore are "not sufficient for a showing that [Father] has engaged in 'wanton disregard.'" We do not agree. Father's criminal record contains seventeen convictions from 2009 to 2014, eight arrest warrants for offenses he allegedly committed in December 2015 and February 2016; the trial record also includes a document titled "Inmate Charge History: Coffee County Sheriffs Department" dated December 31, 2013, which contains 24 entries compiling all the charges Father has faced from 2008 through 2013.[8]

Casyn was born in January 2010, and Cayden was born in November 2012. The record is clear and convincing that, throughout these children's lives, Father has engaged in criminal conduct, substance abuse, and other reckless behavior; he was incarcerated from February 2014 to September 2015 and from February 2016 through the time of trial; and that because of his conduct and behavior, he has been unable to establish a stable father-child relationship with his children. We affirm the holding that Father has engaged in conduct prior to his incarceration in February 2016 that evidenced a wanton disregard for the welfare of Casyn and Cayden.

### C. Best Interest

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the

---

[8] Despite Father's insistence that his convictions have been mainly for property crimes and misdemeanor drug offenses, the record shows that he has been convicted and incarcerated for the following offenses: seven counts of felony burglary of a motor vehicle; felony theft of property; misdemeanor theft of property; felony possession of a weapon by a convicted felon; misdemeanor domestic violence; and five convictions for misdemeanor distribution of marijuana. Further, Father incurred numerous charges since his parole in September 2015, including being arrested in December 2015 for driving on a revoked or suspended license, and in February 2016 for theft of property, two counts of burglary of a motor vehicle, vandalism, illegal possession of a weapon, and aggravated burglary.

child's best interest.[9]  The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dep't. of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).  As we consider this issue, we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests.  The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

---

[9]  The factors at Tenn. Code Ann. § 36-1-113(i) are:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In addressing the best interest determination, the trial court found:

12.     The children have remained in the same foster home since they were removed from their mother's care in December, 2013. The children had significantly elevated needs at the time they came into custody; one of the children required extensive dental surgery and there was reportedly significant developmental delays in both children. Cayden has a significant asthma problem. Casyn has very problematic behavior issues. He has been diagnosed recently with benign Rolandic epilepsy, which is a neurological disorder that affects behavior. The case manager testified that the child has an unusual fixation with death, threatened animals and intentionally let a dog out of captivity resulting in its being hit by a car. The child has intentionally caused flooding in the foster home and has urinated in dishes throughout the house...Vanderbilt's Center of Excellence had been utilized by DCS for assistance in managing the child's behavior. He has had significant problems in school this past year. Casyn's emotional status has been so precarious that the child's therapist stated the child was not ready for visits with his father, and visits were not to occur until [Father] participated in family counseling with the child. The child has had improved behavior since being medicated for the epilepsy. The court finds that the children need a significant amount of structure and attention to their needs. The foster parents have adopted other children, and the foster mother is a stay-at-home parent and are willing to adopt these children.
***
15.     The court finds that termination of [Father's] parental rights to the children Casyn [B.] and Cayden [M.] is in the best interests of the children based upon clear and convincing evidence. In accordance with TCA 36-1-113(i) the court finds the following factors supportive of this finding:

a.     [Father] has not made an adjustment in his circumstances to make it safe for the children to return to his care, despite reasonable efforts provided by DCS.

b.     [Father] has no home in which to care for the children, and will remain incarcerated for a significant amount of time to come. Upon his release from prison he has no prospects of a suitable home or family member to take him in.

c.     [Father] has a long history of criminal activity and substance abuse to which the children would be exposed if returned to his care.

d.     There is no meaningful relationship between [Father] and his children.

e.     Due to the children's significant needs for a stable home environment, changing placement at this time from the foster will

10

have a detrimental effect on the children. The court does not foresee this changing in the near future.

f.      [Father's] substance abuse would prevent him from safely caring for the children and preventing them from further harm.

g.      The foster parents would provide a safe and permanent placement based upon their past history and their expressed intention to adopt the children if allowed.

Father does not assert that any of the court's factual findings are unsupported by the record. Upon our review, we conclude that the evidence in the record supports these findings.

Father argues on appeal that "he was able to meet the majority of the permanency plan requirements" and that "[h]e has made efforts over the pendency of the action to show that it would be in the best interests of the children to be reunified with [him]." We disagree with Father's characterization of his actions while out of prison. As stated previously, Father's life post-incarceration has been punctuated with substance abuse and criminal conduct, and he did not substantially comply with the permanency plan. Meanwhile, Casyn and Cayden are thriving in a structured foster home where their significant mental, physical, and emotional needs are being met. The evidence clearly and convincingly supports the conclusion that termination of Father's rights is in the best interests of Casyn and Cayden.

## IV. CONCLUSION

For the foregoing reasons, we affirm the termination of Father's parental rights.

_____
RICHARD H. DINKINS, JUDGE

11